560 F.2d 94
 23 UCC Rep.Serv. 156
 TRANSCONTINENTAL OIL CORPORATION, Trecon Oil Co. Ltd. and B.
Edwin Sackett, Individually and as nominee,
Plaintiffs-Appellees and Cross-Appellants,
v.
TRENTON PRODUCTS COMPANY, Bernard Fein, Herzfeld & Stern,
Loeb, Rhoades & Co., Gerstley, Sunstein & Company,
A. Arthur Weiss, Louis C. Fieland and
Theresa Zappley, Defendants,
Trenton Products Company and Bernard Fein,
Defendants-Appellants and Cross-Appellees.
TRENTON PRODUCTS COMPANY and Bernard Fein, Defendants and
Third-Party Plaintiffs-Appellants and Cross-Appellees,
v.
Phillip P. GOODKIN, Louis Goodkin, Michael A. Roberts, David
Frankel, James E. Davis, Paul A. Rossborough, J. Streicher &
Company, Harry B. Leslie, Bertram F. Fagenson, Edwin B.
Sackett and Fagenson and Frankel Company Incorporated,
Additional Defendants-Appellees on Counterclaim.
 Nos. 672, 785, Dockets 76-7465, 76-7467.
 United States Court of Appeals,
Second Circuit.
 Argued March 23, 1977.
Decided July 18, 1977.
 
 1
 Stroock & Stroock & Lavan, New York City (Frank G. Raichle, Buffalo, N. Y., and Gerald D. Fischer, New York City, of counsel), for defendants-appellants.
 
 
 2
 Kaufman, Taylor, Kimmel & Miller, New York City (Irwin M. Taylor, New York City, of counsel), for (1) plaintiffs-appellees and cross-appellants and (2) additional defendants-appellees on counterclaim.
 
 
 3
 Before ANDERSON and MESKILL, Circuit Judges, and MARKEY, Chief Judge, U. S. Court of Customs and Patent Appeals.*
 
 
 4
 MARKEY, Chief Judge, U.S. Court of Customs and Patent Appeals.
 
 
 5
 This is an appeal by defendants, Trenton Products Company ("Trenton") and Bernard Fein, and a cross-appeal by plaintiffs, Transcontinental Oil Corporation ("Trans"), Trecon Oil Co. Ltd.[1] and B. Edwin Sackett.[2] Trenton and Fein appeal (1), from the judgment in favor of Trans against Fein, on Count 2, awarding $48,200 (plus interest) as damages resulting from Fein's conversion of 100,000 shares of Trans's common stock, and (2) from the dismissal of their three counterclaims. Trans and Sackett cross-appeal from the dismissal of their Counts 1, 9, and (in part) 10.[3]
 
 The District Court's Findings of Fact
 
 6
 As the district court prefaced its findings, "this action is reminiscent of the puzzles which require tracing paths through a maze in this case, a cat's cradle of stock transfer transactions to reach the desired destination in this case, determination of the ownership of the shares of a corporation which has been the victim over the years of sufficient fraud and embezzlement to scare off a generation of investors."
 
 
 7
 The district court made 91 findings of fact. We summarize those relevant on this appeal as follows:
 
 The Active Parties
 
 8
 (1) Trans is a Delaware corporation with its principal place of business in Connecticut; (2) Sackett, who became a stockholder of Trans in 1950, is the Chairman of the Board of Trans and a citizen of Connecticut; (3) Trenton was a New Jersey corporation which, at the time of commencing this action, had its principal place of business in New York; (4) Fein, a citizen of New York, served without compensation, as a director of Trans from April 3, 1956 until April 12, 1966; as its president from April 4, 1956 to November 30, 1959 and from August 12, 1960 to August 12, 1966; and as chairman of Trans's Board of Directors from November 30, 1959 until October 12, 1966 (from May, 1960 until August 12, 1966, Fein, together with Trenton, a corporation of which Fein was a principal stockholder and at times the president, exercised working control of Trans).
 
 Background
 
 9
 In the early 1950's Fein became a shareholder of Trans, acquiring over 100,000 shares from, among others, a New York stockbroker named Harry B. Leslie (one of the additional defendants below). In 1956, Trans was controlled by a group headed by Samuel Brown and related to the Virginia Iron, Coal & Coke Company. At that time Leslie, with assistance from Fein, led a successful proxy fight to gain control of Trans. Leslie then asked Fein to become president of Trans for a short period until he could find someone more familiar with the oil business to run the company.
 
 
 10
 After Fein assumed the presidency, it was discovered that the prior management had been systematically looting Trans. Brown and his associates bought freedom from civil and perhaps criminal prosecution by a settlement whereby Virginia Iron, Coal & Coke Company purchased all of Trans's wells for $550,000 cash. The bulk of this amount was applied in satisfaction of debentures which the prior management had issued to finance Trans's drilling operations. Trans also acquired Brown's stock in Trans as treasury shares. After paying off the debentures, Trans was left with only two assets, a tax loss, and $55,000 in cash which was used to purchase United States Treasury Bonds.
 
 
 11
 In 1959, Leslie introduced Fein to Orville V. Burkinshaw and Thomas Cairns who were the principals of a Canadian company, Anglo-Pacific Oil and Gas, Ltd. To take advantage of Trans's tax loss carry-forward, Burkinshaw and Cairns proposed that in exchange for 1,000,000 shares of Trans's common stock and other consideration, Trans would acquire from Anglo all the outstanding stock of a corporation which was the owner of a Rangely, Colorado oil property. The proposal was accepted in a written agreement dated October 1, 1959, and 1,000,000 shares were issued to Anglo in care of Burkinshaw on February 5, 1960.
 
 
 12
 As a result of this transaction, Anglo acquired full management and control of Trans. Fein resigned as president of Trans effective November 30, 1959 and Burkinshaw was elected in his place. Burkinshaw and his Anglo associates assumed a majority of the seats on the Trans Board of Directors and all of its executive positions. The books and records of Trans were removed to Anglo's Canadian offices.
 
 
 13
 During Burkinshaw's tenure, the acquisition of an oil and gas property in Sedalia, Alberta, Canada was considered. Because Trans was unable to secure the required financing on its own, Burkinshaw arranged with Fein to raise the needed funds. Fein went to Bernard Green, a Trenton, New Jersey lawyer, who, together with a number of his clients and A. Arthur Weiss (a defendant below), undertook to finance the Sedalia property acquisition. The group of investors, which formed Trenton for this purpose, raised $225,000. Fein added $17,000 of his own and the total of $242,000 was loaned to Trans pursuant to an agreement dated April 11, 1960. In return, Trenton received Trans's note for $242,000 a security interest in the Rangely property, 150,000 shares of original issue Trans stock represented by thirty 5,000-share certificates (the Original Issue shares) and a three-eighths working interest in the Sedalia property.
 
 
 14
 The Original Issue shares were issued on April 25, 1960 pursuant to a resolution adopted by Trans's Board of Directors on April 12, 1960. The certificates were subsequently delivered to Trenton.
 
 
 15
 Anglo, which also wished to participate in the Sedalia property, entered into an agreement with Trenton whereby Anglo received one-third of Trenton's three-eighths working interest in the Sedalia property in exchange for 150,000 shares of the stock Anglo had acquired from Trans in the Rangely transaction. These shares (the Anglo-Trenton shares) were represented by certificates for 100,000 shares and 50,000 shares.
 
 
 16
 Subsequently, Green expressed his view that Trenton was entitled to receive freely transferable shares rather than newly issued, unregistered stock. Therefore, Trans's Board of Directors amended the earlier resolution and on May 27, 1960 authorized the issuance to Trenton of 141,000 treasury shares (the Brown shares) and 9,000 original issue shares to replace the Original Issue shares which were to be surrendered to the corporation. However, they were never cancelled and ultimately came into the possession of Fein.
 
 
 17
 On the same date (April 12, 1960) that the Original Issue shares were authorized, and for reasons which are not clear, Trans's Board of Directors authorized the issuance of 100,000 shares of common stock to Arthur A. Desilets. It appears that Desilets was a mere front for Burkinshaw and that the issuance of these shares was just one of many frauds committed by Burkinshaw's group while it was in control of Trans. These shares (the Desilets shares) were transmitted by the corporation transfer agent to Buchman & Buchman, Trans's attorneys, who notified Fein of their receipt on April 26, 1960 and delivered them to Fein shortly thereafter.[4] Fein testified that he was not aware of the existence of the Desilets shares until the middle of 1966. Upon discovering the certificates for these shares, Fein made no attempt to determine where they came from but simply "assumed" that Trenton was the correct owner. Proceeding upon that assumption, in August, 1966, Fein directed the transfer of 70,000 of the Desilets shares to Louis C. Fieland (a defendant below) and the remaining 30,000 of the Desilets shares to Weiss.
 
 
 18
 Shortly after the Sedalia acquisition was completed in 1960, it was discovered that 25 per cent of the Rangely property, which had been pledged as security for Trenton's loan by Trans, had previously been assigned by Burkinshaw to third parties. It was also discovered that Burkinshaw had overstated the purchase price for the Sedalia property by $65,000 and had misappropriated all but $10,000 of this difference. Upon learning of these acts, Green, who was then Trenton's president, threatened to call the note from Trans and thereby throw Trans into bankruptcy. To forestall that event, the following steps were taken: (1) Burkinshaw and his group surrendered control of Trans; (2) Green and his law partner Robinson, were elected to Trans's Board of Directors; (3) Fein resumed the presidency of the company; (4) Fein personally repaid a substantial sum of money to those Trenton investors who no longer wished to continue their investment; and (5) Fein, as President of Trans, delivered to Green of Trenton a letter dated August 13, 1960 which contained the following paragraph:
 
 
 19
 4. Trenton Products shall be entitled to receive from us, such additional shares of our company as we are able to recover from the former management and control of the company, together with such shares as may be held in the Treasury of the company, as partial recoupment of the damages sustained by you arising out of the failure of this company to perform its obligations, and without further obligation. While it is recognized that such shares have no value at this time due to the condition of the company, it is hoped that forbearance by you may result in this company being restored to viable condition in the immediate future.
 
 
 20
 While Burkinshaw's group was still in control of Trans, Fein engaged Harold Putterman, an accountant, to go to Calgary, Canada, where Burkinshaw had relocated Trans's offices, and examine the company's books and records. During the course of his investigation, Putterman discovered that the $55,000 in United States Treasury Bonds owned by Trans had been embezzled. As partial restitution, Anglo issued a note to Trans for $39,043.50. This note was secured by 500,000 shares (the Collateral Security shares) of the Trans stock which had been acquired by Anglo in the Rangely transaction.
 
 
 21
 Anglo defaulted on the note and the Collateral Security shares were sold by Trans to Trenton in March, 1961, at a private, unadvertised sale attended only by Fein and Green. The 500,000 shares were sold for $10,000 (2 cents per share) despite the fact that Trans had the option of keeping the shares rather than selling them.
 
 
 22
 On August 17, 1960, Anglo transmitted to Trans's attorneys, for delivery to Trans, the remaining 500,000 shares of the 1,000,000 shares it had received in the Rangely transaction. These 500,000 shares (the August 17, 1960 shares) were represented by four certificates. Of these shares, two certificates representing 250,000 shares were delivered to Fein. With respect to these 250,000 shares, 100,000 shares were later delivered to Sackett in settlement of a lawsuit described below, 140,000 shares were transferred to Herzfeld & Stern, and 10,000 shares were transferred to Loeb, Rhoades & Co.
 
 
 23
 After Burkinshaw was removed from office in 1960, income from Trans's sole revenue-producing property, the Rangely field, was withheld as a result of litigation pending against Trans in Colorado. On October 13, 1961, an order was entered in the district court of Colorado appointing a Receiver of the income from the Rangely property. The receivership continued until December 14, 1964, when that court discharged the Receiver and dismissed the action. During this entire period, Trans was without income. Notwithstanding the lifting of the receivership, Trans remained a financial disaster. As described by Trans's counsel in a 1966 affidavit, Trans was "without funds, faced with bleak financial prospects, burdened with debt" and in a "dormant and moribund state."
 
 
 24
 In 1965, Sackett commenced two suits against Trans and its directors. In the Delaware Court of Chancery, Sackett sought an order requiring Trans to hold an election of directors. In the United States District Court for the Southern District of New York, he commenced Sackett v. Transcontinental, 65 Civ. 2500, charging breaches of fiduciary duty and various malfeasances and nonfeasances on the part of the named defendants which included Fein and Trenton. Specifically, the federal complaint charged Fein with having caused the stock of Trans to be issued at nominal, unfair, and inadequate consideration to third parties for his own benefit. It was also claimed that Fein caused large quantities of the issued and outstanding stock of Trans to be purchased for his own benefit under such circumstances that the acquisition of said stock should have been for the benefit of Trans instead of for his own benefit. Sackett demanded judgment enjoining defendants from transferring all shares unlawfully obtained by them since January 1, 1960 and cancelling such shares.
 
 
 25
 In due course, negotiations for settlement of Sackett's lawsuits were entered into. The parties explored the possibility of Sackett purchasing all of Trenton's and Fein's shares of Trans for $280,000. After several months of negotiations, the federal action was settled and a final judgment, approving the settlement as fair and adequate, was entered by District Judge Tyler on July 12, 1966. The settlement was based upon a stipulation, specifically approved by Judge Tyler, consenting to a dismissal of the complaint,
 
 
 26
 with prejudice, against Trans, its successors and assigns and its stockholders, with respect to all claims or causes of action arising from, connected with or related to any of the matters or transactions alleged in the complaint * * * or which could have been asserted thereunder.
 
 
 27
 In addition, general releases, containing essentially the same language, were executed by Trans and delivered to Fein and Trenton.
 
 
 28
 Pursuant to the stipulation, the case was settled on the following terms: (1) Fein released a claim for unpaid salary amounting to approximately $60,000; (2) Fein agreed to deliver a general release executed by Fieland releasing Fieland's $35,000 claim against Trans; (3) Fein's group agreed to surrender management of the corporation to Sackett's group; (4) Sackett agreed to discontinue the Delaware court action; (5) Fein waived any claim for legal fees or other expenses incurred in defending the lawsuits; and, (6) Trans agreed to deliver a general release to Fein.
 
 
 29
 In conjunction with the settlement, and expressly contingent thereon, an agreement dated June 22, 1966 was entered into between Trenton and Sackett, for himself and as "nominee" for others, whereby: (1) Trenton would transfer to Sackett the following assets: 650,000 shares of Trans stock which Trenton owned of record or beneficially; the remaining balance due of $225,460.72 on the loan Trenton had made to Trans to finance the Sedalia transaction and the security therefor; and Trenton's two-eighths interest in the Sedalia property; (2) Sackett agreed to pay Trenton $187,500; (3) Trenton and Fein warranted that to the best of their actual knowledge Trans was not in default under any of the Sedalia oil and gas leases and that the issued and outstanding stock of Trans consisted of not more than 3,600,000 shares of common stock; and (4) damages for breach of the foregoing warranties were not to attach unless the damages arising from all such breaches exceeded $10,000, in which case the total damages recovered were to be limited to $10,000.
 
 
 30
 On August 12, 1966, Fein and Sackett, with their respective attorneys, met to close the June 22, 1966 agreement. Trenton and Fein delivered to Sackett certificates representing a total of 650,000 shares of Trans common stock. The following shares were still held by Trenton: (1) the 150,000 Original Issue shares; (2) the 150,000 Anglo-Trenton shares; (3) the 100,000 Desilets shares; (4) 150,000 shares which were part of the August 17, 1960 shares; and, (5) the shares issued to replace the Original Issue shares (the 141,000 Brown treasury shares and the 9,000 additional shares).
 
 
 31
 On October 6, 1966, Sackett had a stop order sent to the transfer agent for Trans, ordering the agent to stop any further transfer of four categories of shares: (1) the 150,000 Original Issue shares; (2) the 100,000 Desilets shares; (3) the 150,000 shares which were part of the August 17, 1960 shares; and, (4) the 150,000 Anglo-Trenton shares.[5] The stop order stemmed from Sackett's belief that these shares, still held by Trenton after the August 12, 1966 closing, were either converted from Trans or should have been delivered to Sackett pursuant to the June 22, 1966 agreement.
 
 
 32
 The present case was then commenced in February, 1967.
 
 The District Court's Conclusions of Law
 
 33
 Count 1 The Alleged Conversions of Trans Stock
 
 
 34
 (1) The August 17, 1960 Shares. Plaintiffs alleged that Trenton and Fein converted 250,000 shares of the August 17, 1960 shares. The lower court, however, agreed with defendants that these shares became the property of Trenton, pursuant to the letter agreement of August 13, 1960 (quoted above), which provides that Trenton shall receive whatever Trans stock is recovered by Trans from Anglo. Judge Conner stated:
 
 
 35
 The simple fact is that Trenton was a defrauded creditor who could have taken action which would probably have thrown Trans into bankruptcy. Its agreement to settle for, among other things, any stock which Trans might recover from Anglo seems eminently reasonable and even charitable. Indeed, this agreement so dissatisfied some of the Trenton shareholders that Fein felt constrained to buy them out at considerable personal expense.
 
 
 36
 I accordingly find that the letter agreement of August 13, 1960 was not the product of bad faith or even bad judgment on the part of Fein and is enforceable. Thus, the acquisition of the August 17, 1960 shares by Trenton, pursuant to the express terms of the agreement, was a legal acquisition and any claim by Trans with respect to those shares is dismissed.
 
 
 37
 (2) The Collateral Security Shares. Plaintiffs alleged that the foreclosure sale of these 500,000 shares was for inadequate consideration and constituted a conversion of the assets of Trans. Plaintiffs further argued that sound business judgment required that Trans exercise its option to acquire these shares itself rather than selling them for $10,000. The lower court, citing Cromwell v. County of Sac, 94 U.S. 351, 24 L.Ed. 195 (1876) and Ruskay v. Jensen, 342 F.Supp. 264 (S.D.N.Y.1972) (aff'd sub nom. Ruskay v. Waddell, 552 F.2d 392 (2d Cir. 1977)), held this claim respecting the Collateral Security shares barred by res judicata.[6]
 
 
 38
 (3) The Original Issue Shares. Plaintiffs' position was based upon the May 27, 1960 resolution, whereby the Trans Board of Directors authorized the issuance of 141,000 Brown shares and the 9,000 additional new issue shares in exchange for the Original Issue shares. Plaintiffs argued that because there was no consideration running to Trans for the issuance to Trenton of more than 150,000 shares, when Green opted for the Brown shares, the Original Issue shares were nunc pro tunc stripped of the consideration which had supported their issuance and thereby rendered void. The district court held this claim with respect to the Original Issue shares also barred by res judicata, explaining:
 
 
 39
 In any event, assuming arguendo the validity of plaintiffs' contention, any recovery is barred by the doctrine of res judicata. The claim in the present action, as detailed in plaintiffs' post-trial brief, is similar to that made in paragraph 22 of the complaint in the prior action, which reads in part:
 
 
 40
 From time to time, since on or about January 1st, 1960, FEIN has caused the stock of TRANS to be issued at nominal, unfair and inadequate consideration of third parties whose names are not presently known to plaintiff, for the benefit of said defendant. Such issuance and sale of stock have been a waste of the assets of TRANS.
 
 
 41
 Although in plaintiffs' post-trial brief, Fein is not personally charged with having caused the initial issuance of the Original Issue shares, it is claimed that his failure to effect their cancellation did result in
 
 
 42
 1) the continued existence of the Original Issue shares with no consideration to support their issuance,
 
 
 43
 2) a personal benefit to Fein, and,
 
 
 44
 3) a waste of Trans's corporate assets. See Plaintiffs' Post-Trial Main Brief at 27-30.
 
 
 45
 These three elements, lack of consideration, personal benefit and corporate waste, clearly form the basis of both the claim herein and that stated in paragraph 22 of the 1965 complaint.
 
 
 46
 In an attempt to demonstrate the inapplicability of res judicata, plaintiffs have relied upon a comparison of the complaint in the 1965 action with the complaint in this case. With respect to the Original Issue shares, any such comparison is meaningless. The present complaint is expressly limited to 300,000 of the shares issued to Anglo in the Rangely deal. It has nothing whatsoever to do with the claim in question, which was raised for the first time at trial.
 
 
 47
 Thus the 1965 complaint can only be compared with the trial record and the arguments in the post-trial briefs. This comparison makes clear that any claim by plaintiffs against Trenton and Fein with respect to the Original Issue shares is barred by res judicata.
 
 
 48
 Accordingly, the lower court dismissed Count 1.
 
 Count 2 The Desilets Shares
 
 49
 Count 2 originally charged that Fein wrongfully caused the issuance of the Desilets shares. However, when the pre-trial order was filed in October, 1970, plaintiffs altered their theory of recovery and claimed that in 1966, upon first discovering the existence of these shares, Fein chose to ignore the possibility that these shares belonged to Trans and appropriated them to his own use. Fein argued that this count was barred by res judicata, release, and the applicable statute of limitations. The district court concluded that the facts, as established at trial, supported the plaintiffs' theory. Judge Conner explained this conclusion as follows:
 
 
 50
 It is irrelevant that Trenton and Fein were not implicated in the improper issuance of these shares. Upon finding the certificates, Fein should have inquired into their origin. He knew the corporation had been under the control of the swindler Burkinshaw for a period of time in 1959 and 1960 and had no right merely to "assume" that the stock was the property of Trenton. He obviously found it more advantageous to shut his eyes to any possible impropriety and to appropriate the stock to his own use. It was not until 1966, less than two years before the filing of this action, that Fein first exercised dominion and control over the Desilets shares and converted them (Findings 42, 43).
 
 
 51
 The letter agreement of August 13, 1960 does not justify Fein's act. That agreement only applies to treasury stock and to shares recovered from Anglo. The Desilets shares do not fit into either category. Having never been in Anglo's possession or ownership, they could not possibly have been recovered from Anglo, and having been illegally issued without consideration they could never attain the status of treasury shares.
 
 
 52
 I conclude that plaintiffs have sustained their burden with respect to the Desilets shares and are entitled to recover their damages occasioned by Fein's conversion of them.
 
 Counts 9 and 10 Jurisdiction[7]
 
 53
 Counts 9 and 10 charged Trenton and Fein with breaches of contract and warranty and various fraudulent misrepresentations in connection with the agreement of June 22, 1966. Unlike the remainder of the complaint, which sought recovery on behalf of Trans, these two counts were asserted by Sackett individually "and as nominee" of the investors on whose behalf he had negotiated and entered into the June 22 agreement. Defendants contended that diversity jurisdiction had been improperly and collusively invoked, 28 U.S.C. § 1359,[8] and that counts 9 and 10 should be dismissed for lack of subject matter jurisdiction. It was undisputed that the counts were asserted against Fein, a New York citizen, on behalf of a syndicate of eleven investors, all of whose members, except Sackett, were citizens of New York. It was also undisputed that Sackett's personal investment equalled only one-sixteenth of the total syndicate investment.
 
 
 54
 The district court resolved this issue in favor of Sackett and analyzed the facts and law as follows:
 
 
 55
 Under this mandate (28 U.S.C. § 1359), a district judge must disregard the citizenship of nominal or formal parties having no real interest in the litigation and must look to the citizenship of the real parties in interest. Stonybrook Tenants' Assn. v. Alpert, 194 F.Supp. 552, 556 (D.Conn.1961). However, where multiple parties all have a financial interest in a lawsuit, a strategic choice of parties in order to maintain diversity is not considered to be collusive so long as the party chosen to bring the suit is in fact the master of the litigation. Matthies v. Seymour Manufacturing Co., 23 F.R.D. 64, 84 (D.Conn.1958), rev'd on other grounds, 270 F.2d 365 (2d Cir.), reh. denied, 271 F.2d 740 (2d Cir. 1959), cert. denied, 361 U.S. 962, 80 S.Ct. 591, 4 L.Ed.2d 544 (1960); 3A Moore's Federal Practice, P 17.05(3.1) at 160 (2d Ed. 1974).
 
 
 56
 (I)t is evident that Sackett was not improperly or collusively selected within the meaning of 28 U.S.C. § 1359. Sackett has obviously been the leader of the syndicate since its inception. It was he who negotiated and signed the June 22, 1966 agreement out of which the ninth and tenth counts arise; he is clearly the syndicate member most familiar with the matters in suit; he has a real and substantial financial interest in the outcome of the litigation; he had already become the chairman of the board of Trans prior to the commencement of this lawsuit and has continued in that capacity during all the years since. He is no mere formal party.
 
 Count 9 Sale Of The Trenton Shares
 
 57
 Count 9 further alleged that on June 22, 1966 Trenton agreed to sell to Sackett all of the shares of Trans owned by Trenton, which were allegedly represented to aggregate 650,000 shares. It was undisputed that, in fact, Trenton owned additional shares which were not delivered to Sackett at the closing. Sackett claimed that any shares retained by Trenton which had been converted from Trans should be returned to Trans, that any remaining shares held by Trenton should be delivered to him under the terms of the June 22, 1966 agreement, and that damages should be awarded with respect to any shares which could not be delivered. The district court held in favor of defendants and dismissed Count 9, saying:
 
 
 58
 Plaintiffs have failed to carry their burden of establishing that the June 22, 1966 agreement provided for the sale of all Trenton's Trans stock, or that Trenton or Fein represented that Trenton owned only 650,000 shares of Trans stock.
 
 
 59
 Initially conceding that the June agreement is ambiguous and should have been more skillfully drawn, Sackett asserts that its clear import was to transfer Trenton's entire holdings to his syndicate. This alleged intent, which could have so easily been expressed in the agreement, was not specifically set forth.
 
 
 60
 Plaintiffs claim that a businessman of Sackett's acumen would have never agreed to pay $187,000 for anything less than Trenton's entire position. I cannot agree.
 
 
 61
 In exchange for $187,500 in cash, plus discontinuance of the 1965 action, Trenton and Fein gave up:
 
 
 62
 (List of 6 elements of consideration.)
 
 
 63
 Equally unconvincing is Sackett's contention that he was misled by Fein into believing that he was receiving all of Trenton's stock in Trans. Sackett had, for many years prior to commencing the 1965 action, taken an active interest in the affairs of Trans. . . . His attempt to portray himself as uninformed and blindly trusting is at conflict with reality.
 
 
 64
 Sackett also urges that defendants fraudulently misrepresented that the 650,000 shares to be transferred were all the shares owned by Trenton. The evidence does not bear this out.
 
 
 65
 (Quoting testimony and citing evidence.)
 
 
 66
 In sum, the parol evidence adduced at trial at most established only that Mr. Sackett and his attorney assumed that he was purchasing all Trenton's stock in Trans. It failed to establish that Trenton or Fein fraudulently induced this belief or that they had a similar understanding. The agreement must therefore be interpreted as transferring only the 650,000 shares referred to.
 
 Count 10 Breach Of Warranty
 
 67
 Count 10 charged breach of the June 22, 1966 agreement. Specifically, Trenton and Fein were charged with having falsely represented that there were only 3,600,000 shares of Trans stock outstanding when in fact there were 3,977,605 shares, or a little over 10 per cent more. The June 22, 1966 agreement specifically provided:
 
 
 68
 THIRD: Trenton and Fein hereby warrant and represent to Buyer (Sackett) that to the best of Fein's actual knowledge and the actual knowledge of Trenton, as obtained through Fein who is its President:
 
 
 69
 (h) The issued and outstanding stock of Transcontinental consists of not more than 3,600,000 shares of common stock.
 
 
 70
 The district court held in favor of defendants, stating:
 
 
 71
 With respect to warranty (h), clearly the total number of shares of Trans common stock as of the date of the agreement was underestimated by more than 375,000 shares (Ex. 128, Tr. 747-53). However, Sackett has been unable to prove that Fein personally, or Trenton through Fein, had actual knowledge that the number of issued and outstanding shares of Trans common stock was greater than the maximum of 3,600,000 shares he warranted. The stock records of the company had been in hopeless confusion since Texas Bank & Trust Co. had ceased to act as transfer agent and had retained the records as security for the money owed it (Finding 61).
 
 
 72
 Since the express warranties in the agreement extend only to actual knowledge, count ten is dismissed to the extent that it charges a breach of warranty (h).
 
 The Counterclaims
 
 73
 Trenton and Fein asserted three counterclaims attacking the issuance by Trans of the October 6, 1966 stop order, which prevented the sale of thousands of Trans shares held by Trenton.
 
 Counterclaims 1 and 2
 
 74
 Counterclaims 1 and 2 alleged that Trans and Sackett "unlawfully and with reckless and willful disregard of the rights of Trenton and Fein" refused to permit the transfer of shares owned by Trenton. It further charged that Sackett knew Trenton had a legal right to the shares affected, but issued the stop order for personal benefit. It was undisputed that on October 6, 1966 Sackett, as president of Trans, authorized the issuance of the stop order which has prevented the sale of any Trans stock held by Trenton since that date. It was also undisputed that a stockholder generally has the right to have the corporation in which he owns stock transfer that stock pursuant to his instructions. U.C.C. § 8-401.
 
 
 75
 The district court dismissed counterclaims 1 and 2 and discussed that dismissal as follows:
 
 
 76
 One of the instances in which the corporation has the right, and even the duty, to refuse to register a transfer is when adverse claims to the stock are asserted. See U.C.C. §§ 8-301, 8-401, 8-403, 8-404; Kanton v. United States Plastics, Inc., 248 F.Supp. 353, 362 (D.N.J.1965). Indeed, the issuer may be held liable to the adverse claimant if it allows the transfer of a security when it has either actual notice of or sufficient information to put it on inquiry as to the adverse claim. U.C.C. §§ 8-403, 8-404.
 
 
 77
 In this case, a number of claims were made, some by Sackett and his group and some by the corporation itself. Although the claims asserted were, with a single exception (the Desilets shares), rejected (by the district court), (counterclaimants) have failed to prove that the stop order was motivated by bad faith. . . .
 
 
 78
 In all the cases cited by (counterclaimants) as supporting their right to recovery, the impediment which initially justified refusal to transfer shares had been lifted but the defendants nevertheless continued to refuse to effect transfer. (Citing cases.)
 
 
 79
 Furthermore, I am convinced that the stop order was based upon Sackett's sincere belief that there had been numerous wrongs committed both upon him and the corporation. In this, he was not entirely wrong. As the record disclosed, Fein did convert 100,000 shares of Trans stock (the Desilets shares) and had possession of hundreds of thousands of other shares whose origins were in such confusion that it required seven years of pre-trial discovery and a lengthy trial to unravel all the circumstances affecting their ownership.
 
 Counterclaim 3 Rule 10b-5
 
 80
 In counterclaim 3, Trenton and Fein charged Sackett and the syndicate members with violating section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated under the statute, alleging that Sackett and the additional defendants conspired to prevent the sale of Trenton's shares in order to artificially inflate the market price of Trans stock and thereby reap increased profits on their own sales. It was also alleged that Sackett and the additional defendants induced Trenton to relinquish the 650,000 shares involved in the June 22, 1966 agreement by misstating certain material facts and by failing to disclose others. The district court dismissed counterclaim 3:
 
 
 81
 A scrutiny of the post-trial briefs and the record makes it clear that the (counterclaims) have not seriously attempted, much less succeeded, to prove any securities law violations by Sackett and/or the additional defendants.
 
 
 82
 For example, despite the claim that Sackett and the additional defendants conspired to pump up the price of Trans stock for their own benefit, the evidence reveals that only a relatively small number of shares has been sold by the syndicate members in the nine years since the stop order was issued. . . .If there was a conspiracy, it defies reason that only a minority of the conspirators have attempted to profit from it, and those members to only such a limited extent.
 
 
 83
 With respect to the purported misstatements and omissions of material fact, defendants have resented little or no proof as to their existence, much less their materiality.
 
 The District Court's Decision on Damages
 
 84
 The district court held a separate trial to determine the quantum of damages suffered by Trans as a result of the conversion in 1966 by Fein of the 100,000 Desilets shares, and awarded damages in the amount of $48,200, plus interest. The lower court's analysis of the facts and law was as follows:
 
 I.
 
 85
 Under well settled legal principles, the appropriate measure of damages for the conversion of items of fluctuating value, such as stock certificates, is the replacement value the highest market price reached within a reasonable period after the discovery of the conversion. (Citing cases.)
 
 
 86
 Plaintiffs' counsel unfortunately has put in very little proof as to the market value of Trans stock during the applicable period. . . .
 
 
 87
 The "proof" that was offered by Trans on the issue of damages is as follows:
 
 
 88
 1. During 1968 Trans effected private placements of 150,000 shares of treasury stock at fifty cents per share.
 
 
 89
 2. During 1967 and thereafter, when filing his answer and counterclaims, Fein placed a value of seventy cents per share on Trans stock.
 
 
 90
 3. In mid-August 1966, Fein delivered to Fieland 70,000 shares of Trans stock "in lieu of" a $35,000 attorney's fee owed to Fieland.
 
 
 91
 4. The "bid" and "asked" prices for Trans stock, as reported by the National Quotation Bureau.
 
 
 92
 With respect to the first and second proposed bases upon which plaintiff urges this Court to rest an award of damages, it is enough to note that the prices attributed to Trans stock in 1967 and 1968 are too remote in time to serve as a proper gauge in this case. . . .
 
 
 93
 As to the Fieland transaction, although relevant in another context, it does not provide persuasive proof of the fair market value of Trans stock.
 
 
 94
 On the basis of the record now before the Court, the best evidence of the market value of Trans stock during the applicable period is the bid and asked prices for that stock as reported by the National Quotation Bureau (the NQB), a standard reference used by dealers in securities to determine the prices quoted, on a given date, by dealers who are "making the market" in a particular stock. In fact, during the applicable period, the NQB provided the only record of bid and asked prices for over-the-counter stock.
 
 
 95
 Concededly, these quotations do not represent actual transactions, nor do they include retail markup, markdown or commission. However, they do represent a willingness indeed, a commitment to the extent of 100 shares on the part of the listed market makers to entertain contractual bids and offerings at or around the stated prices.
 
 
 96
 During the applicable period, eleven market makers in Trans stock reported "bid" prices ranging from thirty-five to forty-three cents per share and "asked" prices ranging from forty to forty-four cents per share. (Footnote, listing the eleven market makers and their bid/asked prices, omitted.) Applying the so-called "highest market value" rule outlined above, in the absence of any persuasive contrary proof of market value, I find that the replacement value of the converted stock was forty-four cents per share. Incidentally, I have not attempted to determine the premium, if any, which Trans might have had to pay for the acquisition of such a large block of stock in a rather "thin" market, because there was no evidence thereon, and because Trans could have spaced its purchases to minimize their effect on the market price, there being no apparent reason for haste in replacing treasury shares which had been improperly issued years before.
 
 II.
 
 97
 In addition, Trans may recover the amount of any proceeds received by Fein upon his sale of the Desilets stock to the extent such proceeds exceed forty-four cents per share. Frey v. Frankel, 443 F.2d 1240, 1243 (10th Cir. 1971); Gerdes v. Reynolds, 30 N.Y.S.2d 755, 763 (1941), 89 C.J.S. Trover & Conversion § 191, at 654-55. See Jones v. National Chautauqua County Bank of Jamestown, 272 A.D. 521, 74 N.Y.S.2d 498, at 504 (1947).
 
 
 98
 In this context, we refer back to the Fieland transaction.
 
 
 99
 The undisputed evidence at trial established that Fieland's $35,000 fee was reasonable, indeed modest in light of the services he had performed for Trans (Tr. 916-19). Under an agreement with Trans, Fein was obligated to satisfy that debt. We find no significant evidence in the record which would indicate that Fieland was discounting his claim when he accepted the 70,000 Trans shares. If such was the case, the burden was upon Fein to establish what amount properly should be attributed to the Fieland transaction. Cf. Sheldon v. Metro-Goldwyn Pictures Corp., 309 U.S. 390, 406, 60 S.Ct. 681, 84 L.Ed. 825 (1940); Callaghan v. Myers, 128 U.S. 617, 666, 9 S.Ct. 177, 32 L.Ed. 547 (1888); Sheldon v. Metro-Goldwyn Pictures Corp., 106 F.2d 45, 48 (1939), aff'd, 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825 (1940); Szekely v. Eagle Lion Films, Inc., 140 F.Supp. 843, 850 (S.D.N.Y.1956), aff'd 242 F.2d 266 (2d Cir. 1957).
 
 
 100
 Thus, Fein used the converted stock (the stock transferred to Fieland was derived from the Desilets shares) to buy off a $35,000 claim against which he had no apparent defense. Trans is entitled to recover that amount from Fein.
 
 
 101
 The damages are thus computed at the rate of 44 cents per share for 30,000 shares, or a total of $13,200, plus $35,000 for the 70,000 shares given to Fieland in settlement of his claim for a grand total of $48,200. Trans shall have judgment in that amount plus interest thereon at the rate of six per-cent per annum computed on the $35,000 from August 9, 1966, on or about which date the transfer to Fieland was executed, and on the $13,200 from November 14, 1966, the final date of the applicable "reasonable" period for repurchase. Cf. Gerdes v. Reynolds, supra.
 
 OPINION
 
 102
 Neither plaintiffs (cross-appellants), Trans and Sackett, nor defendants (appellants), Trenton and Fein, challenge any finding of fact made by the district court. Each party challenges only the lower court's conclusions of law adverse to it.
 
 
 103
 Count 1 The Alleged Conversions Of Trans Stock
 
 
 104
 ( 1) The August 17, 1960 Shares. Plaintiffs assert that the court below should have held that Trenton and Fein had converted these shares. Their assertion is that "Fein's right to transfer these 250,000 shares to Trenton must be considered in the light of the standards of fairness and fiduciary duty * * *."
 
 
 105
 We see no error in the district court's decision on this issue. The letter agreement of August 13, 1960 does not evidence any violation of the standards of fairness and fiduciary duty. As Judge Conner held, Trenton's acquisition of these shares pursuant to the express terms of that letter agreement was proper.
 
 
 106
 ( 2) The Collateral Security Shares. These 500,000 shares were sold by Trans to Trenton for 2 cents per share in March, 1961, at a private, unadvertised sale attended only by Fein and Green. Plaintiffs contend that the district court erred in holding that the claim to these shares was barred by res judicata. They argue that this claim does not "come within the ambit of the allegations contained in paragraph 23 of the prior complaint."
 
 
 107
 Paragraph 23 of the complaint in the prior (1965) federal action charged:
 
 
 108
 23. From time to time, since on or about January 1st, 1960, Fein has caused to be purchased large quantities of the issued and outstanding stock of Trans under circumstances where the acquisition of said stock should have been for the benefit of Trans instead of for his own benefit. During the said period of time, defendant has dealt with such stock and manipulated the same in such manner as to confer upon himself advantages and benefits which should have accrued to all of the stockholders of Trans and to said Corporation itself.
 
 
 109
 That action was settled and Judge Tyler's July 12, 1966 judgment therein provided in part:
 
 
 110
 Ordered, Adjudged and Decreed that the complaint herein be and the same is hereby dismissed, with prejudice, as against all named defendants, without cost to any party as against any other party, and the said defendants be and are hereby released from any claim or cause of action whatever arising or which may arise out of or in connection with any matter or transaction referred to in the complaint herein;
 
 
 111
 As Judge Conner correctly noted, the present claim was not specifically alleged in the complaint. Plaintiffs' claims at trial must therefore be compared with that in paragraph 23 of the 1965 complaint. Plaintiffs' present claim is that Fein conspired with Trenton to purchase these shares for an inadequate consideration and for their own benefit, when Trans had the right to acquire these Collateral Security shares for itself. We agree with Judge Conner's conclusion that the present claim falls squarely within the allegations of paragraph 23 of the 1965 complaint and that therefore res judicata bars the present claim.
 
 
 112
 ( 3) The Original Issue Shares. Plaintiffs argue that these 150,000 shares "do not come within the description of paragraph 22 of the prior complaint."
 
 
 113
 Paragraph 22 of the complaint in the prior (1965) federal action charged:
 
 
 114
 22. From time to time, since on or about January 1st, 1960, Fein has caused the stock of Trans to be issued at nominal, unfair and inadequate consideration to third parties whose names are not presently known to plaintiff, for the benefit of said defendant. Such issuance and sale of stock have been a waste of the assets of Trans and a dilution of the voting rights and equities of plaintiff and all other stockholders of Trans.
 
 
 115
 Plaintiffs say that the issuance of these shares was not an issuance to "third parties" as alleged in paragraph 22 but was instead an issuance "directly to one of the two defendants (Trenton) named in the litigation."
 
 
 116
 Plaintiffs' "third parties" argument is a hypertechnical interpretation of paragraph 22. Even so, as between Trans and Fein, Trenton was technically a "third party." Moreover, as Judge Conner held, the three elements of lack of consideration, personal benefit, and waste of corporate assets were the common basis for paragraph 22 and for the claim herein. Thus, there was no error in the district court's holding that the claim to these 150,000 shares was barred by res judicata and the dismissal of Count 1 was correct.
 
 Count 2 The Desilets Shares
 
 117
 Fein and Trenton assert that Count 2 should have been dismissed by the court below on the grounds of res judicata and statute of limitations,[9] contending that res judicata should have been invoked because Count 2 duplicated paragraph 22 of the 1965 complaint (quoted above).
 
 
 118
 Count 2, as filed in February, 1967, read as follows:SECOND COUNT ON BEHALF OF TRANS AND AGAINST
 
 TRENTON, FEIN, WEISS AND FIELAND
 
 119
 15. On or about the 12th day of April 1960, and while in control of TRANS, FEIN caused TRANS to authorize the issuance of 100,000 shares of the common stock of TRANS to one, Arthur A. Desilets.
 
 
 120
 16. On or about the 25th day of April 1960, the said 100,000 shares of stock were issued but on information and belief the said stock was never delivered by TRANS to the said Arthur A. Desilets and remained at all times the property of TRANS and within the sole possession and control of FEIN.
 
 
 121
 17. On information and belief, the said 100,000 shares of stock were thereafter appropriated by TRENTON and FEIN to their own uses and purposes, and on or about the 5th day of August 1966, the said 100,000 shares were transferred by TRENTON and FEIN to divers persons, for the sole and exclusive benefit of TRENTON and FEIN, and entirely without any payment or remuneration to TRANS for said 100,000 shares of stock.
 
 
 122
 18. By reason of the foregoing, TRANS has been damaged in the amount of Fifty Thousand ($50,000.00) Dollars.
 
 
 123
 Paragraphs 15 and 16 of Count 2 and paragraph 22 both allege that Fein caused the issuance of Trans stock, but paragraphs 17 and 18 of Count 2 are different because they add the charge of conversion of the already-issued Desilets shares. This difference is further illustrated by the pretrial order of October 15, 1970 which stated:
 
 
 124
 The position of the plaintiffs with respect to each of the ten counts is as follows:
 
 
 125
 SECOND COUNT that some time prior to August 5, 1966, defendants Fein and Trenton misappropriated and converted 100,000 shares of Trans treasury stock, then standing in the name of one Arthur A. Desilets, the exact date of such misappropriation and conversion being unknown to plaintiffs and concealed by said defendants; that on or about August 5, 1966 the said defendants transferred the said 100,000 shares to M. Arthur Weiss (30,000 shares), and Louis C. Fieland (70,000 shares) the latter being one of the defendants herein and that said defendant Fieland had knowledge that defendants Fein and Trenton had no authority to transfer the said shares of stock to him;
 
 
 126
 Thus, the district court correctly held that res judicata was inapplicable to Count 2, the cause of action for conversion of the Desilets shares being a different cause of action from that recited in paragraph 22.
 
 
 127
 Trenton and Fein's next contention is that the claims asserted in Count 2 "relating to the 1960 stock issuance to Desilets, without consideration, and the alleged wrongful possession of said stock by defendants from 1960 to 1966 (are) time barred by the applicable three year statute of limitations for conversion," citing New York Civil Practice Law & Rules (CPLR) § 214; New York Civil Practice Act § 49(7). Defendants' argument is addressed to the cause of action stated in paragraphs 15 and 16 of Count 2 and accruing in 1960. But that cause of action was abandoned in the pre-trial order (quoted above) and the argument lacks merit.
 
 
 128
 Trenton and Fein's final contention with respect to Count 2 is that the "1970 amendment" was a "new claim for relief" alleging a conversion which occurred in 1966 and therefore was barred under New York's three year statute of limitations for conversion. This argument is unsound because the conversion charge (paragraphs 17 and 18 of count 2) has been in the complaint since February, 1967 and was not added in the October, 1970 pre-trial order. As previously stated, the 1970 pre-trial order merely represented an abandonment of the cause of action stated in paragraphs 15 and 16 of Count 2. Thus, the district court correctly held that the cause of action for conversion of the Desilets shares was not barred by the statute of limitations.
 
 
 129
 We conclude that defendants' contentions are unsound and that the district court was correct in holding that plaintiffs had sustained their burden with respect to Fein's conversion of the Desilets shares as alleged in paragraphs 17 and 18 of Count 2.
 
 Count 9 Sale of the Trenton Shares[10]
 
 130
 Sackett argues that the "clear import" of the June 22, 1966 agreement was that, as a "most experienced and knowledgeable businessman," he was acquiring all of Trenton's stock interest in Trans, but fails to point out where this "clear import" is to be found in the contract. Moreover, the district court's invitation to submit parol evidence on the intention of the parties to the agreement was not accepted by either party.
 
 
 131
 We find no error in the district court's holding that Sackett failed to carry his burden of establishing that the June 22, 1966 agreement provided for the sale of all Trenton's Trans stock or that Fein had misrepresented that Trenton owned only 650,000 shares of Trans stock.
 
 Count 10 Breach of Warranty (h)
 
 132
 Sackett argues that "Trenton and Fein breached their express warranty with respect to the number of issued and outstanding shares of Trans stock." The warranty recited "to the best of Fein's actual knowledge and the actual knowledge of Trenton, as obtained through Fein who is its President." Sackett points to no evidence that Fein, or Trenton through Fein, had actual knowledge that the number of shares was more than 3,600,000. As Judge Conner stated, the stock records of Trans "had been in hopeless confusion." Thus, the lower court was correct in dismissing Count 10 to the extent that it charged a breach of warranty (h).
 
 The Counterclaims
 Counterclaims 1 and 2
 
 133
 Counterclaimants contend that they "have been improperly and wrongfully deprived of the ownership of their shares since 1966" by the Trans stop order, and that the lower court "totally ignored the law of conversion."
 
 
 134
 We find no merit in these contentions. The facts do not establish a deprivation of ownership or a conversion. The question is whether Sackett and Trans had reasonable grounds for issuing the stop order. A case relied on by Judge Conner, Kanton v. United States Plastics, Inc., 248 F.Supp. 353, 362 (D.N.J.1965), correctly states the law:
 
 
 135
 The general rule is that a corporation may refuse to register a transfer of stock when it has reasonable grounds for doing so, but it must act in good faith and present some adequate reason for its refusal, and support such refusal by evidence. 12 Fletcher, Cyclopedia Corporations, 1957 Revised Volume, § 5527, at page 587; 18 Am.Jur.2d, Corporations, § 416. Notice of an adverse claim to the stock sought to be transferred is a reasonable ground for temporarily refusing to register the transfer. O'Neil v. Wolcott Mining Co., 174 F. 527, 27 L.R.A., N.S., 200 (8 Cir. 1909); Holmes v. Birtman Electric Co., 18 Ill.2d 554, 165 N.E.2d 261, 75 A.L.R.2d 735 (1960).
 
 
 136
 As Judge Conner stated, the stop order was based on the adverse claims which Sackett and Trans asserted against certain shares, adverse claims which have nowhere been shown to have been motivated by bad faith or to have been totally unreasonable under the circumstances of this case.
 
 
 137
 The district court did not err in dismissing counterclaims 1 and 2.
 
 Counterclaim 3 Rule 10b-5
 
 138
 Trenton and Fein contend that they "established at trial that Sackett and the additional defendants wrongfully prevented the defendants from selling their shares of Transcontinental, while at the same time selling off their own shares in the open market." The record, however, does not support the argument. Nothing of record establishes that the stop order was wrongful or that Sackett and the additional defendants were "selling off their own shares." As Judge Conner pointed out, "the total sales of all the syndicate members has averaged only 13,000 shares per year and a majority of the syndicate members has not sold a single share." It is also plain that the record does not establish scienter (i. e., intent to deceive, manipulate, or defraud), a necessary element of a private cause of action for damages under § 10(b) and Rule 10b-5. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 95 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The district court correctly dismissed counterclaim 3.
 
 Damages
 
 139
 Trenton and Fein first contend that it was erroneous for the lower court to rely on the National Quotation Bureau (NQB) bid and asked prices, when proof of actual sale prices was available but not offered by Trans.
 
 
 140
 It is undisputed that the district court employed the correct measure of damages as stated in In re Salmon Weed & Co., 53 F.2d 335, 341 (2d Cir. 1931):
 
 
 141
 (U)nder the New York rule the measure of damages for conversion applicable in this situation is the market value of the stock at the time of the unauthorized hypothecation, or the market value within a reasonable time after notice of the hypothecation, whichever amount is the higher.
 
 
 142
 Defendants' argument is that plaintiffs did not offer the best available evidence of the highest actual market value. Judge Conner recognized this weakness when he stated: "Plaintiffs' counsel unfortunately has put in very little proof as to the market value of Trans stock during the applicable period." Nevertheless the NQB quotations represented a commitment, to the extent of a block of 100 shares, on the part of the eleven brokers who were market makers in Trans stock. Thus, while the NQB quotations do not necessarily represent actual trades, they constitute some objective evidence of market value. The district court relied on them "in the absence of any persuasive contrary proof of (actual) market value." Thus, the district court simply determined market value on the basis of a preponderance of the evidence of record. We see no reversible error in that approach.
 
 
 143
 Defendants' second contention is that it was improper to include the full amount ($35,000) of the debt which was discharged when Fein transferred 70,000 of the 100,000 Desilets shares to Fieland. They say that this claim was never relied upon by plaintiffs at trial and that they were never given the opportunity to show whether Fieland was accepting those shares in full satisfaction of his $35,000 claim or whether he was discounting his claim.
 
 
 144
 The district court properly took into account the discharge of Fein's debt upon the transfer of the 70,000 shares to Fieland. Frey v. Frankel, 443 F.2d 1240, 1243-1244 (10th Cir. 1971), stated the point:
 
 
 145
 We agree that the general rule is that the proper measure of damages in a conversion case is the value of the property as of the time of the conversion. However, it has been held that such does not preclude one from recovering the amount of the proceeds received by the converter upon his sale of the property previously converted by him. Gerdes v. Reynolds, Sup., 30 N.Y.S.2d 755. For general background material on this particular matter, see 89 C.J.S. Trover & Conversion § 191, pp. 654-655.
 
 
 146
 With respect to defendants' argument that this claim was never made by plaintiffs, we note this statement in defendants' brief: "The only contention made by plaintiffs at the trial on damages was that 'Fieland was accepting the 70,000 shares . . . in lieu of $35,000' and 'that certainly is one piece of proof as to the value then placed by the parties on those 70,000 shares.' " We believe plaintiffs' argument at trial fairly apprised defendants of this claim. Plaintiffs were also arguing for the higher valuation of 70 cents per share recited in defendants' counterclaims, hence plaintiffs' reliance upon the Fieland transaction was just one of their contentions. But if defendants desired to challenge plaintiffs' contention that Fieland accepted the 70,000 shares in discharge of the $35,000 debt, they should have done so at trial. The district court did not err by including the full $35,000 in the computation of damages.
 
 
 147
 The district court correctly awarded to Trans damages in the total amount of $48,200 plus interest as stated in that court's judgment.
 
 
 148
 Appellants and cross-appellants have shown no error in any of the conclusions of law of the district court, its judgment is affirmed.
 
 
 
 *
 Hon. Howard T. Markey, sitting by designation
 
 
 [1]
 Trecon is a wholly-owned Canadian subsidiary of Trans
 
 
 [2]
 The district court's decision is unreported. The lower court held a nonjury trial on the issue of liability and filed a sixty-four page written opinion on that issue, then held a nonjury trial on the issue of damages and filed a ten page written opinion on that issue
 
 
 [3]
 The district court ordered Trans and Sackett "to remove all restrictions on transfers of Transcontinental Oil Corporation stock certificate numbers (specifying certain stock certificate numbers) and all other stock certificates issued in lieu thereof." In view of our affirmance, that order should now be executed
 
 
 [4]
 According to an interrogatory answered by Desilets, he remembered signing stock powers for these shares but he did not remember "to whom I signed over the Certificates."
 
 
 [5]
 The stop order did not cover the shares issued to replace the Original Issue shares (the 141,000 Brown treasury shares and the 9,000 additional shares)
 
 
 [6]
 The trial court stated:
 In their effort to demonstrate a variance between the prior and present claims, plaintiffs apparently place principal reliance upon the fact that paragraph 22 of the prior complaint refers to "third parties," whereas Fein and Trenton are currently charged with having misappropriated the Collateral Security shares for themselves. This argument, however, misses the point, since my ruling herein is based upon paragraph 23 of the prior complaint which, as plaintiffs' own reply brief recognizes, charged Fein,
 with having purchased issued and outstanding stock of TRANS where he should have made the purchase for the benefit of TRANS instead of for his own benefit. (Plaintiffs' Post-Trial Reply Brief at 4).
 I therefore conclude that any claim Trans may have against Trenton or Fein with respect to the Collateral Security shares is barred as being identical to or at least "arising from, connected with or relating to" the matter alleged in the prior action; certainly such claims "could have been asserted" in support of the allegations in the prior action.
 
 
 [7]
 Counts 3, 4 and 8 were withdrawn by plaintiffs. The district court's dismissal of Counts 5, 6, and 7 has not been appealed
 
 
 [8]
 28 U.S.C. § 1359. Parties collusively joined or made
 A district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court.
 
 
 [9]
 Defendants' brief refers to "res judicata, collateral estoppel, release and limitations" but their substantive argument is directed only to res judicata and statute of limitations
 
 
 [10]
 With respect to counts 9 and 10, we fully agree with the district court's holding that Sackett is a proper nominee plaintiff and that the failure to name the other syndicate members as parties plaintiff does not violate 28 U.S.C. § 1359